**CINDERELLA THEATER CO., Inc., et al. v.
SIGN WRITERS' LOCAL UNION NO.
591 et al.
No. 6191.**

District Court, E. D. Michigan, S. D.
March 6, 1934.

Ralph E. Routier, of Detroit, Mich., for plaintiffs.

William L. Thorp, of Detroit, Mich., for defendants.

TUTTLE, District Judge.

This suit involves the construction and constitutionality of the act of Congress of March 23, 1932 (chapter 90, §§ 1–15, 47 Statutes at Large, 70–73), being sections 101–115 of title 29 of the United States Code (29 USCA §§ 101–115), entitled "An Act to amend the Judicial Code and to define and limit the jurisdiction of courts sitting in equity, and for other purposes," the provisions of which act, if valid, materially restrict the power of federal courts with respect to the issuance of injunctions in labor disputes.

The plaintiffs, Cinderella Theater Company, Inc., and Imperial Building Corporation, are Delaware corporations which own and operate moving picture theaters in the city of Detroit, and the defendants, Sign Writers' Local Union No. 591, an unincorporated association, which is a labor union, and its officers, are citizens and residents of Michigan, the jurisdiction of this court being properly invoked upon the basis of the

requisite diversity of citizenship accompanied by the statutory amount of the value of the matter in controversy.

The bill of complaint alleges that the defendants have been pursuing a course of unlawful conduct, consisting specifically of the placing of stench bombs in the plaintiffs' said theaters, the mutilation of signs and posters displayed by the plaintiffs on the outside of such theaters, the maintenance of patrols in front of the entrances to such theaters, bearing signs reciting that the said theaters are "unfair to organized labor," and the distribution of cards containing similar language, all with the object and effect of causing the patrons of such theaters to discontinue such patronage, and thereby to compel the plaintiffs to discharge from their employ a certain nonunion sign writer and to employ in his place a member of the defendant union; and the bill prays that the defendants be enjoined by this court from continuing the acts and conduct so alleged. The answer of the defendants denies that they have been guilty of any unlawful act towards the plaintiffs and asks for a dismissal of the bill. After a full hearing of the evidence of the parties in open court, the cause was heard and submitted on the pleadings and proofs and on the briefs of counsel for the parties, to all of which pleadings, proofs, and briefs, and to the questions thereby raised and discussed, I have devoted most careful consideration and study.

The material facts, as I find them from the record, may be stated, sufficiently for the purposes of this opinion, as follows:

The plaintiffs for several years have owned and operated, in the city of Detroit, the Cinderella Theater and the Roosevelt Theater, both of which are moving picture theaters which have enjoyed a considerable patronage by the general public. In January, 1933, the plaintiffs were requested, by officers of the defendant union, to discharge from their employ their one sign writer, a certain George Campbell, who was not, and is not, a member of any labor union, and to employ in his place a union sign writer, which request was promptly refused, for the reason that he had been a faithful, efficient employee of the plaintiffs for the preceding seven years and his services were entirely satisfactory to them. A few days later, and in the same month, on two successive Sundays, so-called stench bombs were discharged, by unknown persons who have not been discovered or identified, in the said Roosevelt Theater, as a result of which the performances then in progress were interrupted and a number of disgusted patrons left the theater, some of whom have never returned. There has been no recurrence of this outrage in either theater since January, 1933. Beginning, however, shortly afterwards, and following another request by a representative of the defendant union for the discharge of this employee (which request also was refused) and continuing thereafter, except for certain intervals, during the remainder of the year 1933, the advertising posters and signs in front of the said theaters were, on numerous occasions and usually at night, defaced and mutilated by unknown persons who were never apprehended, discovered, or identified, such posters and signs being cut and torn so as to be illegible, and stickers containing the words, "Unfair to Organized Labor," being pasted thereon.

.Finally, commencing in the middle of December, 1933, and continuing, with substantial regularity, until the filing of this bill of complaint on January 3, 1934, and the issuance of the preliminary restraining order· thereon, the defendant union established and maintained in front of each of the said theaters patrols, consisting of what are commonly known as "sandwich men," who, in groups of two or sometimes three, walked abreast, back and forth, on the public sidewalk in front of the entrance of each of the said theaters, carrying signs bearing the words, "Please Do Not Patronize This Theater. Unfair to Sign Writers' Union," and "This Theater Unfair to Organized Labor." Cards bearing similar language were distributed in the neighborhood of each of the two theaters. The plaintiffs appealed to the lieutenant in charge of a police station in Detroit to stop the patrolling of these "sandwich men," but were informed by him that the police would not interfere unless a disturbance of the peace was being created or pedestrians were being obstructed or interfered with, and, as no such disturbance, obstruction, or interference appeared, the police refused to take any action in the matter. It is not shown that the acts just mentioned were accompanied by any fraud or violence, or that they were not peaceable.

It is clear that, while it would be practically impossible for the police to prevent stench bombing and sign mutilations, because of the difficulty of catching and identifying the offenders, they are willing and anxious so to do. They could easily prevent the patrolling, as well as the displaying of "Unfair" signs or banners and the distribution of the cards in question, if they wished so to do, so that it cannot be said that the pub-

lic officers charged with the duty to protect the plaintiffs' property are unable to furnish to plaintiffs adequate protection against such patrolling, sign displaying, or card distribution, although they are, for the reason already stated, unwilling so to do. The natural and inevitable effect of the acts already described would be, and has been, the loss to the plaintiffs of at least some of the patronage of their theaters by the public, with consequent financial damage to their business. It does not, however, appear from any direct evidence or other clear proof that any of the defendants actually participated in, actually authorized, or ratified, any of the acts of bombing and destruction of which the plaintiffs complain. Nor is it shown, or claimed by the plaintiffs, that they made every reasonable effort, or any effort, to settle the dispute here involved, either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration.

The defendants deny that they have authorized or sanctioned any bombing, mutilation, or defacement of signs or posters, or any other act of violence or lawlessness toward the plaintiffs or their property. They admit, however, that they established and maintained, and are responsible for, the patrols and "Unfair" signs in question and the distribution of cards of similar import, but insist that not only are they entitled so to do under general principles of law and equity, but also that under the circumstances presented here this court cannot, even though the patrolling be unlawful, grant to the plaintiffs any of the injunctive relief sought against the defendants, for the reason that the power to grant such relief has been taken away from this court by the provisions of the act of Congress already cited. With this latter contention of the defendants, after a careful study of the language of the act and of the legal rules and principles applicable, I agree, for reasons now to be stated.

The act in question is, as already noted, entitled, "An Act to amend the Judicial Code and to define and limit the jurisdiction of courts sitting in equity, and for other purposes."

It will be noted that the act does not attempt to broaden, limit, or define the rights of either employee or employer, nor does it assume to place any restrictions upon the state courts. The sole purpose seems to be to regulate, define, and limit the power of federal courts in labor disputes. The provisions applicable here are contained in sections 1, 2, 4, 5, 6, 7, 8, 9, and 13 of the act (29 USCA §§ 101, 102, 104, 105, 106, 107, 108, 109, 113).

Section 1 is as follows:

"No court of the United States, as herein defined, shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in a strict conformity with the provisions of this act; nor shall any such restraining order or temporary or permanent injunction be issued contrary to the public policy declared in this act."

Section 2 provides as follows:

"In the interpretation of this act and in determining the jurisdiction and authority of the courts of the United States, as such jurisdiction and authority are herein defined and limited, the public policy of the United States is hereby declared as follows: Whereas under prevailing economic conditions, developed with the aid of governmental authority for owners of property to organize in the corporate and other forms of ownership association, the individual unorganized worker is commonly helpless to exercise actual liberty of contract and to protect his freedom of labor, and thereby to obtain acceptable terms and conditions of employment, wherefore, though he should be free to decline to associate with his fellows, it is necessary that he have full freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment, and that he shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection; therefore, the following definitions of, and limitations upon, the jurisdiction and authority of the courts of the United States are hereby enacted."

Section 4 includes the following provisions:

"No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute (as these terms are herein defined) from doing, whether singly or in concert, any of the following acts: * * * (e) Giving publicity to the existence of, or the facts involved in, any labor dispute, whether by

advertising, speaking, patrolling, or by any other method not involving fraud or violence; (f) Assembling, peaceably to act or to organize to act in promotion of their interests in a labor dispute; (g) Advising or notifying any person of an intention to do any of the acts heretofore specified; (h) Agreeing with other persons to do or not to do any of the acts heretofore specified; and (i) Advising, urging, or otherwise causing or inducing without fraud or violence the acts heretofore specified."

Section 5 is as follows:

"No court of the United States shall have jurisdiction to issue a restraining order or temporary or permanent injunction upon the ground that any of the persons participating or interested in a labor dispute constitute or are engaged in an unlawful combination or conspiracy because of the doing in concert of the acts enumerated in section 4 [section 104] of this act."

Section 6 is in the following language:

"No officer or member of any association or organization, and no association or organization participating or interested in a labor dispute, shall be held responsible or liable in any court of the United States for the unlawful acts of individual officers, members, or agents; except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof."

Section 7 contains the following provisions:

"No court of the United States shall have jurisdiction to issue a temporary or permanent injunction in any case involving or growing out of a labor dispute, as herein defined, except * * * after findings of fact by the court, to the effect—(a) That unlawful acts have been threatened and will be committed unless restrained or have been committed and will be continued unless restrained, but no injunction or temporary restraining order shall be issued on account of any threat or unlawful act excepting against the person or persons, association, or organization making the threat or committing the unlawful act or actually authorizing or ratifying the same after actual knowledge thereof; * * * (e) That the public officers charged with the duty to protect complainant's property are unable or unwilling to furnish adequate protection."

Section 8 reads as follows:

"No restraining order or injunctive relief shall be granted to any complainant who has failed to comply with any obligation imposed by law which is involved in the labor dispute in question, or who has failed to make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration."

Section 9 contains the following language:

"Every restraining order or injunction granted in a case involving or growing out of a labor dispute shall include only a prohibition of such specific act or acts as may be expressly complained of in the bill of complaint or petition filed in such case."

Section 13 includes the following definitions:

"When used in this act, and for the purposes of this act—(a) A case shall be held to involve or to grow out of a labor dispute when the case involves persons who are engaged in the same industry, trade, craft, or occupation; or have direct or indirect interests therein; or who are employees of the same employer; or who are members of the same or an affiliated organization of employers or employees; whether such dispute is (1) between one or more employers or associations of employers and one or more employees or associations of employees; (2) between one or more employers or associations of employers and one or more employers or associations of employers; or (3) between one or more employees or associations of employees and one or more employees or associations of employees; or when the case involves any conflicting or competing interests in a 'labor dispute' (as hereinafter defined) of 'persons participating or interested' therein (as hereinafter defined). (b) A person or association shall be held to be a person participating or interested in a labor dispute if relief is sought against him or it, and if he or it is engaged in the same industry, trade, craft, or occupation in which such dispute occurs, or has a direct or indirect interest therein, or is a member, officer, or agent of any association composed in whole or in part of employers or employees engaged in such industry, trade, craft, or occupation. (c) The term 'labor dispute' includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and em-

ployee. (d) The term 'court of the United States' means any court of the United States whose jurisdiction has been or may be conferred or defined or limited by Act of Congress, including the courts of the District of Columbia."

■ It is urged by the plaintiffs that this statute is an unwarranted and unconstitutional attempt by Congress to invade the province, and to usurp the functions, of federal courts, in contravention of the provisions of section 1 of article 3 of the United States Constitution, providing that "the judicial Power of the United States shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish," and of section 2 of the same article, providing that "the judicial Power shall extend * * * to Controversies * * * between citizens of different States."

■ I am unable to agree with this contention, which seems to me to overlook or ignore the settled rule in the federal courts to the effect that, inasmuch as all federal courts inferior to the Supreme Court are dependent for their very creation upon the will of Congress, such courts have only whatever jurisdiction is conferred upon them by Congress, which may either destroy, in whole or in part, or may limit as it deems advisable, such jurisdiction. Cary v. Curtis, 3 How. (44 U. S.) 236, 11 L. Ed. 576; Sheldon v. Sill, 8 How. (49 U. S.) 441, 12 L. Ed. 1147; United States v. Tillou, 6 Wall. (73 U. S.) 484, 18 L. Ed. 920; Ex parte Robinson, 19 Wall. (86 U. S.) 505, 22 L. Ed. 205; Kline v. Burke Construction Co., 260 U. S. 226, 43 S. Ct. 79, 82, 67 L. Ed. 226, 24 A. L. R. 1077; Standard Nut Margarine Co. v. Rose (D. C.) 41 F.(2d) 385; Kinloch Telephone Co. v. Local Union (D. C.) 265 F. 312.

In the words of the Supreme Court in Kline v. Burke Construction Co., just cited:

"Only the jurisdiction of the Supreme Court is derived directly from the Constitution. Every other court created by the general government derives its jurisdiction wholly from the authority of Congress. That body may give, withhold or restrict such jurisdiction at its discretion, provided it be not extended beyond the boundaries fixed by the Constitution."

As was pointed out by the Supreme Court in Sheldon v. Sill, supra, 8 How. (49 U. S.) 441, at page 448, 12 L. Ed. 1147:

"The third article of the Constitution declares that 'the judicial power of the United States shall be vested in one Supreme Court, and such inferior courts as the Congress may, from time to time, ordain and establish.' The second section of the same article enumerates the cases and controversies of which the judicial power shall have cognizance, and, among others, it specifies 'controversies between citizens of different States.' * * * It must be admitted, that if the Constitution had ordained and established the inferior courts, and distributed to them their respective powers, they could not be restricted or divested by Congress. But as it has made no such distribution, one of two consequences must result,—either that each inferior court created by Congress must exercise all the judicial powers not given to the Supreme Court, or that Congress, having the power to establish the courts, must define their respective jurisdictions. The first of these inferences has never been asserted, and could not be defended with any show of reason, and if not, the latter would seem to follow as a necessary consequence. And it would seem to follow, also, that, having a right to prescribe, Congress may withhold from any court of its creation jurisdiction of any of the enumerated controversies. Courts created by statute can have no jurisdiction but such as the statute confers."

The applicable rule was stated and discussed by the Supreme Court in Cary v. Curtis, supra, 3 How. (44 U. S.) 236, at page 245, 11 L. Ed. 576, as follows:

"The judicial power of the United States, although it has its origin in the Constitution, is (except in enumerated instances, applicable exclusively to this court) dependent for its distribution and organization, and for the modes of its exercise, entirely upon the action of Congress, who possess the sole power of creating the tribunals (inferior to the Supreme Court) for the exercise of the judicial power, and of investing them with jurisdiction either limited, concurrent, or exclusive, and of withholding jurisdiction from them in the exact degrees and character which to Congress may seem proper for the public good. To deny this position would be to elevate the judicial over the legislative branch of the government, and to give to the former powers limited by its own discretion merely. It follows, then, that the courts created by statute must look to the statute as the warrant for their authority; certainly they cannot go beyond the statute, and assert an authority with which they may not be invested by it, or which may be clearly denied to them. This argument is

in nowise impaired by admitting that the judicial power shall extend to all cases arising under the Constitution and laws of the United States. Perfectly consistent with such an admission is the truth, that the organization of the judicial power, the definition and distribution of the subjects of jurisdiction in the federal tribunals, and the modes of their action and authority, have been, and of right must be, the work of the legislature. The existence of the Judicial Act itself, with its several supplements, furnishes proof unanswerable on this point. The courts of the United States are all limited in their nature and constitution, and have not the powers inherent in courts existing by prescription or by the common law."

It cannot, in my opinion, be doubted that the statute here involved is a valid exercise by Congress of its constitutional power to limit the jurisdiction of the federal courts which it has created and whose jurisdiction, therefore, to issue injunctions in labor disputes is as much subject to such congressional power of limitation, or even of prohibition, as is, for example, their jurisdiction to restrain proceedings for the collection of taxes or proceedings in state courts, which jurisdiction was at an early date subjected by Congress to the limitations, respectively, of section 3224 of the United States Revised Statutes (now section 154 of Title 26 of the United States Code [26 USCA § 154]), providing that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court," and of section 720 of the United States Revised Statutes (now section 379 of Title 28 of the United States Code [28 USCA § 379]), providing that "the writ of injunction shall not be granted by any court of the United States to stay proceedings in any court of a State, except in cases where such injunction may be authorized by any law relating to proceedings in bankruptcy." Neither of those statutes appears to have ever been declared unconstitutional. The one first mentioned, relative to the restraining of tax collection, has been he'd to be constitutional (Pullan v. Kinsinger, 20 Fed. Cas. page 44, No. 11463), but seems to be applicable to the collection only of federal taxes and not of state taxes (State Railroad Tax Cases, 92 U. S. 575, 23 L. Ed. 663). The only case cited by the plaintiffs in support of their argument in this connection, United States v. Klein, 13 Wall. (80 U. S.) 128, 20 L. Ed. 519, involved an act of Congress which attempted to abridge the appellate jurisdiction conferred on the Supreme Court by the Consti-

tution itself, and the decision in that case is therefore clearly inapplicable here.

A comparison of the provisions of this act already quoted with the foregoing findings of fact makes it clear that this statute is applicable here. The case at bar comes clearly within the definitions and requirements of section 13.

I am compelled by subparagraph (a) of section 13 of the Act (29 USCA § 113 (a) to hold the case "to involve or to grow out of a labor dispute" for the following reasons:

(1) "The case involves persons who are engaged in the same industry"; namely, the theater industry.

(2) "The case involves persons who * * * have direct or indirect interests" in the same industry; namely, the theater industry.

(3) "The case involves * * * conflicting * * * interests in a labor dispute" of "persons participating or interested" therein.

I am compelled by subparagraph (b) of section 13 of the Act (29 USCA § 113 (b) to hold that the defendants are interested in this particular "labor dispute" for the following reasons:

(1) Because "relief is sought against" them in this court.

(2) Because they are "engaged in the same industry," namely, the theater industry, "in which such dispute occurs."

(3) Because they have "a direct or indirect interest therein."

I am compelled by subparagraph (c) of section 13 of the Act (29 USCA § 113 (c) to hold this controversy to be a "labor dispute" for the following reasons:

(1) Because it is a "controversy concerning terms or conditions of employment."

(2) Because it is a "controversy * * * concerning the association of persons in * * * seeking to arrange terms or conditions of employment."

By the express terms of the statute, this is none the less a "labor dispute" because of the fact that none of the officers or members of the defendant union have any contractual relation with the plaintiffs, and none of "the disputants stand in the proximate relation of employer and employee." If the applicability of the statute were otherwise doubtful, such doubt would be removed by a consideration of the following language in the report of the House Committee on the

Judiciary (H. R. Report 669, 72d Congress, First Session), favorably reporting the bill (H. R. 5315) a few days before its passage:

"In the case of Duplex Printing Press Co. v. Deering (254 U. S. 443 [41 S. Ct. 172, 65 L. Ed. 349, 16 A. L. R. 196]), decided January 3, 1921, and being a six to three decision, the court held so far as pertinent to this particular discussion that this section of the Clayton Act provided a restriction upon the use of the injunctions in favor only of the immediate disputants and that other members of the union not standing in the proximate relation of employer and employee could be enjoined. Of course, it is fundamental that a strike is generally an idle gesture if confined only to the immediate disputants. This is intended to be remedied by the later provision in this act defining the meaning of the term, 'person participating in a labor dispute,' as to whom, as in the bill defined, the courts are deprived of jurisdiction to issue injunctions in the specified instances set forth in this section. * * *

"Section 13 contains definitions which speak for themselves. It is hardly necessary to discuss them other than to say that these definitions include, as hereinabove stated, a definition of a person participating in a labor dispute which is broad enough to include others than the immediate disputants and thereby corrects the law as announced in the case of Duplex Printing Press Co. v. Deering, supra, wherein the Supreme Court reversed the circuit court of appeals [252 F. 722] and held that the inhibition of section 20 of the Clayton Act [29 USCA § 52] only related to those occupying the position of employer or employee and no others. The Supreme Court held to the same effect in the case of the American Steel Foundries Co. v. Tri-City Central Trades Council [257 U. S. 184, 42 S. Ct. 72, 66 L. Ed. 189, 27 A. L. R. 360], supra."

The same purpose to make this statute applicable to a case such as is presented here is also manifested by the following language of the report of the Senate Committee on the Judiciary (S. R. Report 163), favorably reporting the same bill (S. 935) at the same session of Congress:

"Section 13 of the bill defines various terms used in the act, and it is not believed that any criticism has been or will be made to these definitions. * * * In order that the limitation may not be whittled away by refined definitions of what persons are to be regarded as legitimately involved in labor disputes, the bill undertakes specifically to designate those persons who are entitled to invoke the protections of the procedure required."

Applying, then, the applicable provisions of this valid statute, so quoted, to the material facts hereinbefore stated, I cannot avoid the conclusion that such statute deprives the plaintiffs of the right to any of the relief here sought against the defendants, even if in the state court, or in this court in the absence of such a statute, the plaintiffs would be entitled to some, or all, of such relief, as to which question there is no occasion to express an opinion here.

In compliance with the requirements of section 9 of the act (29 USCA § 109), already quoted, any injunction to be granted in such a case as this must be limited to the restraining of only "such specific act or acts as may be expressly complained of in the bill of complaint." The "specific" acts so charged in this bill and established by the evidence consist of the aforementioned bombings, mutilations of signs, patrolling with "unfair" signs, and distribution of "unfair" cards.

At the outset it is to be noted that, by section 7 (e) and section 8 of the act (29 USCA §§ 107 (e), 108), Congress has prescribed two general conditions to the granting of any injunctive relief by this court in a labor dispute, namely, that it must appear that, as required by section 7 (e), "the public officers charged with the duty to protect complainant's property are unable or unwilling to furnish adequate protection," and, as provided by section 8, "no restraining order or injunctive relief shall be granted to any complainant who has failed * * * to make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration." It is obvious that by these provisions Congress manifested its intent that, before a party should be entitled to any injunction to restrain any acts in a labor dispute in a federal District Court, such party must have (1) attempted to obtain adequate relief from the public authorities just mentioned and have been unsuccessful in such attempt, and (2) must have made the efforts thus required to settle the dispute and been unsuccessful in such efforts. If it does not affirmatively appear that such a party has exhausted both of these possible remedies, he cannot

resort to this court for any injunctive relief in such a dispute. Have the plaintiffs here complied with both of these conditions?

From the findings of fact hereinbefore recited, it is apparent that the public authorities in question are unable to furnish adequate protection to the plaintiffs with respect to the stench bombs and sign mutilations involved, and are unwilling, for the reason already stated, to furnish such protection against the aforesaid patrolling and "unfair" signs and cards. To that extent, therefore, the plaintiffs have satisfied this particular requirement.

In view, however, of the fact that the plaintiffs have not shown that they have made the efforts at settlement of this dispute which the act makes mandatory, it is clear that this court is without jurisdiction to grant any of the injunctive relief here sought.

In addition, however, to these broad limitations on the right to any injunction in a labor dispute in this court, the act also prescribes, by other sections thereof already quoted, certain more specific restrictions on the right to an injunction against various kinds of particular acts in such a dispute; and the construction and effect of such other restrictions, as applied to the present case, may, it seems to me, properly be mentioned and discussed at this time, although, in view of the conclusion just reached, it is not strictly necessary to a determination of this cause.

As to the lawless acts of the unknown stench bombers and poster vandals, in view of the absence, already noted, of clear proof of actual participation in, actual authorization of, or ratification of, such acts, by any of the defendants, an injunction against the defendants on account of those acts is precluded here by section 6 of the statute (29 USCA § 106), requiring "clear proof" of participation, authorization, or ratification of such acts, as a prerequisite to liability therefor on the part of an association interested in a labor dispute. I conclude that this provision, if not within the power of Congress, already considered, to define and limit the jurisdiction of this court, is, in the language of the Supreme Court in Fong Yue Ting v. United States, 149 U. S. 698, at page 729, 13 S. Ct. 1016, 1028, 37 L. Ed. 905, "within the acknowledged power of every legislature to prescribe the evidence which shall be received, and the effect of that evidence, in the courts of its own government." To the same effect is Bailey v. Alabama, 219 U. S. 219, 31 S. Ct. 145, 55 L. Ed. 191.

Do the patrolling with "unfair" signs and the distribution of "unfair" cards constitute "giving publicity to the existence of, or the facts involved in, any labor dispute, whether by advertising, speaking, patrolling, or by any other method not involving fraud or violence," or "assembling peaceably to act or to organize to act in promotion of their interests in a labor dispute," within the prohibition from injunctive process prescribed by section 4 (e) and section 4 (f), respectively, of the act (29 USCA § 104 (e, f)? The purpose of this section was stated in the aforementioned report of the said House Committee as follows:

"These are the same character of acts which Congress in section 20 of the Clayton Act of October 15, 1914 [29 USCA § 52], sought to restrict from the operation of injunctions, but because of the interpretations placed by the courts on this section of the Clayton Act, the restrictions as contained therein have become more or less valueless to labor, and this section is intended by more specific language to overcome the qualifying effects of the decisions of the courts in this respect. * * *

"In the case of the American Steel Foundries Co. v. Tri-City Central Trades Council, supra, there was a strike, and, of course, a picket line. There was practically no fraud or violence but the persistent giving of publicity to the facts involved in the dispute and the persistent advising of other persons without fraud or violence not to work for the employer. It was thought by the labor union that section 20 prohibited an injunction against such acts, but the Supreme Court held that such acts could be enjoined, and, therefore, the legislation proposed specifically restricts the courts in this respect unless the acts are accompanied by fraud or violence."

The banners and cards used in this dispute, when fairly interpreted, attempt to advise the public, including the people who patronize, or who may patronize, the particular theaters, that the owners of such theaters are unfair to organized labor, and attempt to persuade such patrons and prospective patrons on that account not to patronize such theaters. I am of the opinion that these are the kinds of acts which Congress had particularly in mind when it provided that in cases of this kind federal courts should not restrain any one from "giving publicity to the existence of, or the facts involved in, any labor dispute, whether by advertising, speaking, patrolling, or by any other meth-

od not involving fraud or violence." The banners and cards here used carry the language usually employed by organized labor when it gets into dispute with an employer. Every observing person who has walked the streets of our large cities during the past score of years has seen many banners of this kind. The members of Congress were, of course, familiar with the use of banners and cards carrying the words "unfair to organized labor" when they employed the language of this statute. They, of course, knew that there is seldom a labor dispute in which banners are not used carrying the words "unfair to organized labor." These words have come to mean in the minds of the public that the employer and the labor organization are in a dispute and that the organization is claiming that the employer is unfair. When Congress provided that the federal courts could not restrain labor organizations from "giving publicity to the existence of, or the facts involved in, any labor dispute * * * by * * * patrolling," it, of course, had in mind these usual banners carried by the men patrolling and bearing the words "unfair to organized labor." The only thing mentioned in the act which would remove the restriction and permit the court to enjoin would be fraud or violence in accompaniment with the patrolling with the banners and cards. No claim is made in the case at bar that the advertising and patrolling were accompanied by violence. It is claimed that these acts were accompanied by fraud. This claim is based on the contention that the plaintiffs' theaters were not unfair to organized labor, and that therefore the advertising was false and fraudulent.

■ It seems to me that the statements on these signs and cards to the effect that the plaintiffs or their theaters are "unfair" to organized labor, fairly interpreted, should be construed as meaning, and intended to mean, only that as a result of a disagreement between plaintiffs and defendants the defendants considered the plaintiffs unfair and that such alleged unfairness was the cause and subject of a labor dispute between them and the plaintiffs, to which dispute they were thus giving publicity. I am convinced also that this would be the understanding created by that language in the minds of the public to whose attention it was brought. This act has to do with labor disputes. The very fact that it is a dispute indicates that there is disagreement and conflicting views.

The federal courts are prohibited from interfering with a full and free advertising of those conflicting views. I am of the opinion that the court in construing this statutory provision cannot split hairs on the question whether or not the plaintiffs are "fair" or "unfair" toward "organized labor." It is generally recognized that signs usually are mere sketches. It is not possible to tell a long story with them. What one person might call being unfair to organized labor another person might well call entirely fair. The defendants, if they are entitled to carry banners and signs, will not be able to paint the whole story on such banners or signs. They will naturally, if not necessarily, use adjectives which one man will say are too strong and another will say are too weak. For example, is it being unfair to organized labor to employ nonunion labor? I cannot avoid the conclusion that the acts of the defendants in connection with this patrolling and these "unfair" signs and cards do constitute the "giving publicity to the existence of, or the facts involved in, any labor dispute," and also the "assembling peaceably to act or to organize to act in promotion of their interests in a labor dispute," within the meaning of section 4 of the act (29 USCA § 104). The method used did not, in my opinion, involve "fraud," within the meaning of the statute.

It may be added that there is here no evidence or claim that any interstate commerce is in any way affected by, or involved in, the present labor dispute, for which reason, if for no other, the cases cited and discussed by counsel for the plaintiffs involving combinations or conspiracies in restraint of interstate commerce have no pertinency to this case. I express no opinion as to whether an injunction in a labor dispute against a combination or conspiracy in restraint of interstate commerce comes within section 5 of the act (29 USCA § 105), prohibiting an injunction "upon the ground that any of the persons participating or interested in a labor dispute constitute or are engaged in an unlawful combination or conspiracy because of the doing in concert of the acts enumerated" in section 4.

For the reasons stated, I reach the conclusion that the plaintiffs are not entitled to any of the relief sought and that the bill of complaint must be dismissed, with costs to the defendants. A decree to that effect will be entered.