## Alliance Auto Service, Inc., v. Cohen et al.

*Emanuel Moss*, for plaintiff.
*William A. Gray*, for defendants.

DAVIS, P. J., May 26, 1939.—Plaintiff, a corporation, engaged in the business of selling petroleum products at retail, at various service station locations in Philadelphia, filed a bill in equity for an injunction to restrain defendants, members and officers of Local 107, of the International Brotherhood of Teamsters, Chauffeurs, Stablemen

and Helpers of America, an unincorporated labor association, affiliated with the American Federation of Labor, from alleged unlawful acts of interference with its business.

Plaintiff complains that defendants have entered into an illegal and unlawful conspiracy to discourage the general public from patronizing plaintiff's service stations, by means of an illegal secondary boycott; that plaintiff has no business relation or transaction with any of the defendants of any kind whatsoever; that defendants are not seeking to organize plaintiff's employes; that plaintiff is not in any way involved in any labor dispute with defendants, or with any other person, or any other organization whatsoever; that the picketing of plaintiff's service stations constitutes a nuisance in law and fact, detrimental to the free conduct of plaintiff's business, interferes with the free ingress and egress of the public to plaintiff's service stations, subjects plaintiff to unfair and erroneous publicity, and injures plaintiff's goodwill and business.

Plaintiff seeks a preliminary injunction restraining defendants from instituting or maintaining a boycott of the plaintiff company, or picketing the service station locations of plaintiff and carrying placards, or distributing circulars, urging the public not to patronize plaintiff company.

Upon the hearing, on May 12, 1939, William A. Gray, counsel for defendants, stated that there was a labor dispute between defendants and the Petrol Oil Company; that plaintiff is a distributor of Petrol products exclusively, and that defendants have one picket at several of the stations of plaintiff, publicizing the fact that Petrol is unfair to organized labor.

Counsel for defendants contended that defendants have a right to publicize, in front of a distributor's place of business, the fact that defendants were having labor difficulty with the Petrol Company and that the Petrol Company was unfair to labor.

On behalf of plaintiff, it was testified by Hugo V. Spitzer that defendants were picketing 15 service stations of plaintiff by walking in front of its driveways, bearing signs which read "Petrol unfair to organized labor, A. F. of L. 107"; that plaintiff has no dispute concerning wages, hours, or conditions of labor with the employes of any union; that it is not in any business way or any other way connected with the Petrol Company, except that Petrol supplies plaintiff with Cities Service gasoline, but that plaintiff has no interest in Cities Service, and that company has no interest in plaintiff's company; that the Acme Transfer Company had refused to deliver equipment to one of plaintiff's service stations, stating that it was informed by the American Federation of Labor that they could not cross the picket lines and deliver the equipment; that at its service station, Sixteenth and Vine Streets, where the driveway was being repaired, the Warren Supply Company, which supplied ready-mixed concrete, refused to make a second delivery, because of the presence of a picket, and plaintiff could not finish its work; that the general nature of plaintiff's business is gasoline service stations and plaintiff operates 32 stations in Philadelphia, in which it sells gasoline, supplied by the Petrol Company.

Walter J. Mucher testified that he was employed by the Acme Fast Freight Co., Inc., a carloading company; that the Acme Fast Freight Co. had two shipments to two of plaintiff's service stations, but that the operator brought both shipments back to the platform of the company because there was a picket line around the places and he would not pass through the picket lines.

Frank S. Creedon, manager of plaintiff's service station at 314 S. Second Street, testified that a picket had asked the operator of a truck of the Economy Provision Co., who sought to purchase gasoline at his service station, whether he had known there was a picket line around the station, and when the driver answered no, he told him

"You know you crossed it, and you also belong to the union, and you know there is a fine on crossing a picket line"; that, in consequence, this particular truck driver, who had purchased gas daily, had not returned for a week.

Jules Scogna, manager of plaintiff's service station at southeast corner Third and Spring Garden Streets, testified that on one occasion, when a truck of the Kersol Company came to his station for gas, the picket spoke to the driver, whereupon the driver said to the witness, "Don't put any more gas in my truck, that is going to get me in trouble, they will tear my book up", meaning his union book; that plaintiff had the Kersol business for about two and a half to three years prior to that incident, but has had no business from that company since that time; that the witness asked the picket why he had said that to the driver and the picket had replied "There is the Petrol pump out there—that's all I can do—that fellow is breaking the rule when he breaks the picket line"; that as a result of the picketing he has lost about 70 percent of the business usually done at his station, whereas prior to the picketing that station averaged $100 a day, since the picketing started it has averaged between $30 and $35 a day.

Edward Logan, manager of plaintiff's service station at southeast corner Broad Street and Glenwood Avenue, testified that at his station, by reason of the picketing, there has been a decrease of approximately $10 to $15 a day in business.

Charles Nigra, manager of the station at southeast corner Broad and Poplar Streets, testified that by reason of the picketing he lost the servicing of 21 trucks.

Thomas Sirolli, assistant supervisor of plaintiff's stations, testified that on one occasion, at plaintiff's service station at Broad and Poplar Streets, a prospective customer had intended to purchase gas, when a picket came over and spoke to him, and the customer drove out of the station without making a purchase and said to the

manager, "I can't do business with you while that man is walking up and down in front of your station"; that at the station at Broad Street and Glenwood Avenue, a prospective customer spoke to the picket there and then came back and told the service manager "Don't do anything to that automobile"; that at the Sixteenth and Vine Streets station and Fifth and Bainbridge Streets station, pickets stood in the driveways; that in addition to Petrol products, plaintiff sells Coca-Cola, candy, cigarettes, simonizes, polishes, and washes cars, sells spark plugs, oil filters, tires, tubes, batteries, and affords a complete tire and automobile service.

John Watchorn, manager of the service station at Sixteenth and Vine Streets, testified that frequently prospective customers, who drive up to the pump, ride away again without making any purchase when they see the picket sign; that as many as 10 cars a day drove up to the pump and drove out again, without making a purchase; that that station had lost a couple of trucking firms, by reason of the picket line; and that its business had decreased by about $20 to $25 a day.

Upon the conclusion of the testimony, the court declined defendants' motion to dismiss the bill.

William F. Kelleher then testified, on behalf of defendants, that the full title of Local No. 107 was "Highway Truck Drivers and Helpers Local 107, International Brotherhood of Teamsters, Chauffeurs, Stablemen and Helpers of America, affiliated with the American Federation of Labor"; that for the purpose of giving publicity to the labor dispute between that organization and the Petrol Company the union had assigned one picket to each of the stations of plaintiff company, because it was selling Petrol products.

Plaintiff contends that no "labor dispute" exists between it and its employes, and defendants' course of conduct, which prevents free access of its customers to its places of business, has caused intentional injury to plain-

tiff and constituted an unlawful secondary boycott, which should be restrained. Counsel for plaintiff argues that since no "labor dispute" exists, within the meaning of the Pennsylvania Labor Anti-Injunction Act of June 2, 1937, P. L. 1198, the act is inapplicable, and, as it deprives plaintiff of its remedy to protection against a direct injury to its property right, without due process, it is invalid under the Fourteenth Amendment of the United States Constitution.

Defendants contend that a "labor dispute" does exist, in which plaintiff is interested as the distributor of the products of their employer, and that an injunction may not issue against their peaceful picketing of plaintiff's places of business.

The question involved is whether a preliminary injunction may issue to restrain defendants from picketing persons other than their immediate employer?

In 1895, the United States Supreme Court declared that the power to issue injunctions in cases involving labor disputes and to punish their violation, as for contempt, was inherent in the courts: In re Debs, 158 U. S. 564.

Congress attempted to limit this right by the enactment of the Clayton Act of October 15, 1914, 38 Stat. at L. 730. However, the interpretation placed upon this act, by judicial decision, soon rendered it ineffective as a means of limiting injunctive relief in labor disputes: Duplex Printing Press Co. v. Deering et al., etc., 254 U. S. 443; American Steel Foundries v. Tri-City Central Trades Council et al., 257 U. S. 184.

Congress then enacted the Federal Anti-Injunction Act of March 23, 1932, 47 Stat. at L. 70, sometimes known as the Norris-LaGuardia Act. Its purpose is to limit and define the jurisdiction of the Federal courts in granting restraining orders or injunctions in cases involving or growing out of labor disputes.

The act has been construed as a valid exercise of congressional authority: Cinderella Theater Co., Inc., et al.

v. Sign Writers' Local Union No. 591 et al., 6 F. Supp. 164; United Electric Coal Cos. v. Rice et al., 80 F. (2d) 1.

A number of States supplemented the Norris-La Guardia Law by enacting State anti-injunction laws, many of which have been patterned after the Federal laws, and which deprive State courts of the power to enjoin "peaceful picketing or patrolling."

On June 2, 1937, the Pennsylvania Labor Anti-Injunction Act, supra, was approved, and its constitutionality was sustained in Lipoff v. United Food Workers, etc., et al., 33 D. & C. 599 (C. P. No. 6). Section 6 provides that:

"No court of this Commonwealth shall have jurisdiction or power in any case involving or growing out of a labor dispute to issue any restraining order or temporary or permanent injunction which, in specific or general terms, restrains or prohibits any person, association or corporation from doing, whether singly or in concert", certain enumerated acts which include:

"(e) Giving publicity to, and obtaining or communicating information regarding the existence of, or the facts or merits involved in, any labor dispute, whether by advertising, speaking or picketing or patrolling any public street or place where any person or persons may lawfully be, or by any other method not involving misrepresentation, fraud, duress, violence, breach of the peace or threat thereof. . . .

"(g) Persuading by any lawful means other persons to cease patronizing or contracting with or employing or leaving the employ of any person or persons. . . .

"(m) Advising, urging or otherwise causing or inducing, without misrepresentation, fraud or violence, others to do or not to do the acts heretofore specified".

The statute is applicable only in cases in which a "labor dispute" exists, or "involving or growing out of a labor dispute", and its protection is confined to "persons participating or interested in a labor dispute."

Subsection (*a*) of section 3 of the act provides a case shall be held to involve or to grow out of a labor dispute when the case involves persons who are engaged in the same industry—or have direct or indirect interest therein —or when the case involves any conflicting or competing interests in a "labor dispute" of "persons participating or interested" therein.

Subsection (*b*) characterizes "a person participating or interested in a labor dispute if relief is sought against him or it, and if he or it is engaged in the same industry . . . in which such dispute occurs or has a direct or indirect interest therein".

Subsection (*c*) defines a "labor dispute" as including "any controversy concerning terms or conditions of employment . . . regardless of whether or not the disputants stand in the proximate relation of employer and employe".

In Dorrington et al. v. Manning et al., 135 Pa. Superior Ct. 194, Judge Baldrige stated:

"Thus far there are no decisions of our appellate courts interpreting the phrase 'labor dispute,' as used in our act. . . . Although the definition of 'labor dispute,' as used in our act, is comprehensive and should be given a broad interpretation, consistent with the purposes of the act as set forth in section 2, it seems manifest that a dispute is not a labor dispute unless the controversy is over 'terms or conditions of employment,' or 'the association or representation of persons in negotiating . . . or seeking to arrange terms or conditions of employment . . .," as defined in paragraph (*c*) of section 3 of the act."

Defendants do not claim that there is any controversy with plaintiff concerning the terms or conditions of employment. Plaintiff is a stranger to defendants, and has nothing to mediate with their union. The whole aim of the injury here inflicted by defendants was to compel plaintiff to influence and coerce the employers of defendants to comply with their demands. The picketing of

plaintiff's places of business make it appear to its customers that it is a party to a labor dispute. The object and effect of the whole proceeding was to direct undesirable publicity, not at the Petrol Company, but rather at its customer, plaintiff. The very fact that the picketing centers about plaintiff's places of business imputes that pressure is being exerted against plaintiff. Picketing is an affirmative interference. Defendants' pickets did more than merely patrol plaintiff's places of business. From the testimony, it appears that the Acme Transfer Company refused to deliver equipment to one of plaintiff's service stations because it was warned not to cross the picket lines to deliver the equipment; that the Warren Supply Company refused to deliver concrete because of the presence of a picket; that a picket had asked the operator of a truck of the Economy Provision Company, who sought to purchase gasoline at one of plaintiff's service stations, whether he had known that there was a picket line around the station, and when the driver answered no, he told him "You know you crossed it, and you also belong to the union, and you know there is a fine on crossing a picket line"; that the pickets would persuade prospective customers of plaintiff not to purchase gas; that at one station, a truck driver, after the picket addressed him, refused to purchase any more gas as he feared that he might lose his union book; that pickets stood in the driveways and interfered with automobiles coming in and out of the service stations. The conduct of defendants' pickets exceeded the rights granted them under section 6 of the act, and, if persisted in, may destroy plaintiff's business. Although defendants may urge that their picketing may be for the purpose of disseminating information and seeking support from the ultimate customers of their employers' products, it is coercive, since it tends to restrain the exercise of a free will by the consumer. Such coercion constituted a secondary boycott. The legislature has laid down the conditions under

which picketing is permitted. It never contemplated nor validated "secondary picketing". The Anti-Injunction Act should not be construed to refuse relief in cases of secondary boycott.

In Goldfinger v. Feintuch, etc., 276 N. Y. 281, relied on by defendants, Judge Finch, who delivered the opinion of the court, declared it is illegal to picket the place of business of a retailer "not himself a party to an industrial dispute" to persuade the public to withdraw its patronage generally from the business for the purpose of coercing the owner to take sides in a controversy in which he has no interest. Judge Lehman, who concurred in holding the picketing involved lawful, declared it "is not a 'secondary boycott.' " Judge Rippey concurred in the result only because there was a finding of "unity of interest" of the parties without which "the facts would establish a secondary boycott and would be illegal", and Judge Hubbs dissented because he found "a secondary boycott and I think it is illegal".

In Main Cleaners & Dyers, Inc., v. Columbia Super Cleaners, Inc., et al., 332 Pa. 71, 75, Mr. Justice Stern held the court below had general jurisdiction to entertain a bill even though it might ultimately appear to be without power to issue an injunction as prayed for because the case involved or grew out of a labor dispute, as defined by section 3 of the Act of 1937, stating:

"The fact that a labor dispute may be involved does not take the litigation out of this jurisdictional class. All that the Act of June 2, 1937, P. L. 1198, in effect provides is that, in any case involving or growing out of a labor dispute, the court shall not have the power to issue injunctions to prohibit the particular acts specified in sections 6 and 7."

Plaintiff is entitled to enjoin defendants from the acts complained of. Until final hearing, defendants and the members of Local No. 107 of the International Brotherhood of Teamsters, Chauffeurs, Stablemen and Helpers

of America, are restrained from instituting or maintaining a boycott of plaintiff company, or picketing the service station locations and places of business of plaintiff company.